Cite as: 590 U. S. ____ (2020)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

—————

Nos. 17–1618, 17–1623 and 18–107

—————

GERALD LYNN BOSTOCK, PETITIONER

17–1618               *v.*

CLAYTON COUNTY, GEORGIA

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT


ALTITUDE EXPRESS, INC., ET AL., PETITIONERS

17–1623               *v.*

MELISSA ZARDA AND WILLIAM ALLEN MOORE, JR., CO-INDEPENDENT EXECUTORS OF THE ESTATE OF DONALD ZARDA

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT


R.G. & G.R. HARRIS FUNERAL HOMES, INC., PETITIONER

18–107               *v.*

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 15, 2020]

JUSTICE GORSUCH delivered the opinion of the Court.

Opinion of the Court

Sometimes small gestures can have unexpected consequences. Major initiatives practically guarantee them. In our time, few pieces of federal legislation rank in significance with the Civil Rights Act of 1964. There, in Title VII, Congress outlawed discrimination in the workplace on the basis of race, color, religion, sex, or national origin. Today, we must decide whether an employer can fire someone simply for being homosexual or transgender. The answer is clear. An employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex. Sex plays a necessary and undisguisable role in the decision, exactly what Title VII forbids.

Those who adopted the Civil Rights Act might not have anticipated their work would lead to this particular result. Likely, they weren't thinking about many of the Act's consequences that have become apparent over the years, including its prohibition against discrimination on the basis of motherhood or its ban on the sexual harassment of male employees. But the limits of the drafters' imagination supply no reason to ignore the law's demands. When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit.

I

Few facts are needed to appreciate the legal question we face. Each of the three cases before us started the same way: An employer fired a long-time employee shortly after the employee revealed that he or she is homosexual or transgender—and allegedly for no reason other than the employee's homosexuality or transgender status.

Gerald Bostock worked for Clayton County, Georgia, as a child welfare advocate. Under his leadership, the county won national awards for its work. After a decade with the

Opinion of the Court

county, Mr. Bostock began participating in a gay recreational softball league.  Not long after that, influential members of the community allegedly made disparaging comments about Mr. Bostock's sexual orientation and participation in the league.  Soon, he was fired for conduct "unbecoming" a county employee.

Donald Zarda worked as a skydiving instructor at Altitude Express in New York.  After several seasons with the company, Mr. Zarda mentioned that he was gay and, days later, was fired.

Aimee Stephens worked at R. G. & G. R. Harris Funeral Homes in Garden City, Michigan.  When she got the job, Ms. Stephens presented as a male.  But two years into her service with the company, she began treatment for despair and loneliness.  Ultimately, clinicians diagnosed her with gender dysphoria and recommended that she begin living as a woman.  In her sixth year with the company, Ms. Stephens wrote a letter to her employer explaining that she planned to "live and work full-time as a woman" after she returned from an upcoming vacation.  The funeral home fired her before she left, telling her "this is not going to work out."

While these cases began the same way, they ended differently.  Each employee brought suit under Title VII alleging unlawful discrimination on the basis of sex.  78 Stat. 255, 42 U. S. C. §2000e–2(a)(1).  In Mr. Bostock's case, the Eleventh Circuit held that the law does not prohibit employers from firing employees for being gay and so his suit could be dismissed as a matter of law.  723 Fed. Appx. 964 (2018).  Meanwhile, in Mr. Zarda's case, the Second Circuit concluded that sexual orientation discrimination does violate Title VII and allowed his case to proceed.  883 F. 3d 100 (2018).  Ms. Stephens's case has a more complex procedural history, but in the end the Sixth Circuit reached a decision along the same lines as the Second Circuit's, holding that Title VII bars employers from firing employees because of

Opinion of the Court

their transgender status. 884 F. 3d 560 (2018). During the course of the proceedings in these long-running disputes, both Mr. Zarda and Ms. Stephens have passed away. But their estates continue to press their causes for the benefit of their heirs. And we granted certiorari in these matters to resolve at last the disagreement among the courts of appeals over the scope of Title VII's protections for homosexual and transgender persons. 587 U. S. ___ (2019).

## II

This Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment. After all, only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives. And we would deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations. See *New Prime Inc.* v. *Oliveira*, 586 U. S. ___, ___–___ (2019) (slip op., at 6–7).

With this in mind, our task is clear. We must determine the ordinary public meaning of Title VII's command that it is "unlawful . . . for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." §2000e–2(a)(1). To do so, we orient ourselves to the time of the statute's adoption, here 1964, and begin by examining the key statutory terms in turn before assessing their impact on the cases at hand and then confirming our work against this Court's precedents.

Opinion of the Court

### A

The only statutorily protected characteristic at issue in today's cases is "sex"—and that is also the primary term in Title VII whose meaning the parties dispute. Appealing to roughly contemporaneous dictionaries, the employers say that, as used here, the term "sex" in 1964 referred to "status as either male or female [as] determined by reproductive biology." The employees counter by submitting that, even in 1964, the term bore a broader scope, capturing more than anatomy and reaching at least some norms concerning gender identity and sexual orientation. But because nothing in our approach to these cases turns on the outcome of the parties' debate, and because the employees concede the point for argument's sake, we proceed on the assumption that "sex" signified what the employers suggest, referring only to biological distinctions between male and female.

Still, that's just a starting point. The question isn't just what "sex" meant, but what Title VII says about it. Most notably, the statute prohibits employers from taking certain actions "because of" sex. And, as this Court has previously explained, "the ordinary meaning of 'because of' is 'by reason of' or 'on account of.'" *University of Tex. Southwestern Medical Center* v. *Nassar*, 570 U. S. 338, 350 (2013) (citing *Gross* v. *FBL Financial Services, Inc.*, 557 U. S. 167, 176 (2009); quotation altered). In the language of law, this means that Title VII's "because of" test incorporates the "'simple'" and "traditional" standard of but-for causation. *Nassar*, 570 U. S., at 346, 360. That form of causation is established whenever a particular outcome would not have happened "but for" the purported cause. See *Gross*, 557 U. S., at 176. In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause.

This can be a sweeping standard. Often, events have multiple but-for causes. So, for example, if a car accident

Opinion of the Court

occurred *both* because the defendant ran a red light *and* because the plaintiff failed to signal his turn at the intersection, we might call each a but-for cause of the collision. Cf. *Burrage* v. *United States*, 571 U. S. 204, 211–212 (2014). When it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision. So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law. See *ibid.*; *Nassar*, 570 U. S., at 350.

No doubt, Congress could have taken a more parsimonious approach. As it has in other statutes, it could have added "solely" to indicate that actions taken "because of" the confluence of multiple factors do not violate the law. Cf. 11 U. S. C. §525; 16 U. S. C. §511. Or it could have written "primarily because of" to indicate that the prohibited factor had to be the main cause of the defendant's challenged employment decision. Cf. 22 U. S. C. §2688. But none of this is the law we have. If anything, Congress has moved in the opposite direction, supplementing Title VII in 1991 to allow a plaintiff to prevail merely by showing that a protected trait like sex was a "motivating factor" in a defendant's challenged employment practice. Civil Rights Act of 1991, §107, 105 Stat. 1075, codified at 42 U. S. C. §2000e–2(m). Under this more forgiving standard, liability can sometimes follow even if sex *wasn't* a but-for cause of the employer's challenged decision. Still, because nothing in our analysis depends on the motivating factor test, we focus on the more traditional but-for causation standard that continues to afford a viable, if no longer exclusive, path to relief under Title VII. §2000e–2(a)(1).

As sweeping as even the but-for causation standard can be, Title VII does not concern itself with everything that happens "because of" sex. The statute imposes liability on

Opinion of the Court

employers only when they "fail or refuse to hire," "discharge," "or otherwise . . . discriminate against" someone because of a statutorily protected characteristic like sex. *Ibid.* The employers acknowledge that they discharged the plaintiffs in today's cases, but assert that the statute's list of verbs is qualified by the last item on it: "otherwise . . . discriminate against." By virtue of the word *otherwise*, the employers suggest, Title VII concerns itself not with every discharge, only with those discharges that involve discrimination.

Accepting this point, too, for argument's sake, the question becomes: What did "discriminate" mean in 1964? As it turns out, it meant then roughly what it means today: "To make a difference in treatment or favor (of one as compared with others)." Webster's New International Dictionary 745 (2d ed. 1954). To "discriminate against" a person, then, would seem to mean treating that individual worse than others who are similarly situated. See *Burlington N. & S. F. R. Co.* v. *White*, 548 U. S. 53, 59 (2006). In so-called "disparate treatment" cases like today's, this Court has also held that the difference in treatment based on sex must be intentional. See, *e.g., Watson* v. *Fort Worth Bank & Trust*, 487 U. S. 977, 986 (1988). So, taken together, an employer who intentionally treats a person worse because of sex—such as by firing the person for actions or attributes it would tolerate in an individual of another sex—discriminates against that person in violation of Title VII.

At first glance, another interpretation might seem possible. Discrimination sometimes involves "the act, practice, or an instance of discriminating categorically rather than individually." Webster's New Collegiate Dictionary 326 (1975); see also *post,* at 27–28, n. 22 (ALITO, J., dissenting). On that understanding, the statute would require us to consider the employer's treatment of groups rather than individuals, to see how a policy affects one sex as a whole versus the other as a whole. That idea holds some intuitive appeal

too. Maybe the law concerns itself simply with ensuring that employers don't treat women generally less favorably than they do men. So how can we tell which sense, individual or group, "discriminate" carries in Title VII?

The statute answers that question directly. It tells us three times—including immediately after the words "discriminate against"—that our focus should be on individuals, not groups: Employers may not "fail or refuse to hire or . . . discharge any *individual*, or otherwise . . . discriminate against any *individual* with respect to his compensation, terms, conditions, or privileges of employment, because of such *individual's* . . . sex." §2000e–2(a)(1) (emphasis added). And the meaning of "individual" was as uncontroversial in 1964 as it is today: "A particular being as distinguished from a class, species, or collection." Webster's New International Dictionary, at 1267. Here, again, Congress could have written the law differently. It might have said that "it shall be an unlawful employment practice to prefer one sex to the other in hiring, firing, or the terms or conditions of employment." It might have said that there should be no "sex discrimination," perhaps implying a focus on differential treatment between the two sexes as groups. More narrowly still, it could have forbidden only "sexist policies" against women as a class. But, once again, that is not the law we have.

The consequences of the law's focus on individuals rather than groups are anything but academic. Suppose an employer fires a woman for refusing his sexual advances. It's no defense for the employer to note that, while he treated that individual woman worse than he would have treated a man, he gives preferential treatment to female employees overall. The employer is liable for treating *this* woman worse in part because of her sex. Nor is it a defense for an employer to say it discriminates against both men and women because of sex. This statute works to protect individuals of both sexes from discrimination, and does so

equally.  So an employer who fires a woman, Hannah, because she is insufficiently feminine and also fires a man, Bob, for being insufficiently masculine may treat men and women as groups more or less equally.  But in *both* cases the employer fires an individual in part because of sex.  Instead of avoiding Title VII exposure, this employer doubles it.

### B

From the ordinary public meaning of the statute's language at the time of the law's adoption, a straightforward rule emerges:  An employer violates Title VII when it intentionally fires an individual employee based in part on sex.  It doesn't matter if other factors besides the plaintiff's sex contributed to the decision.  And it doesn't matter if the employer treated women as a group the same when compared to men as a group.  If the employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee—put differently, if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred.  Title VII's message is "simple but momentous":  An individual employee's sex is "not relevant to the selection, evaluation, or compensation of employees." *Price Waterhouse* v. *Hopkins*, 490 U. S. 228, 239 (1989) (plurality opinion).

The statute's message for our cases is equally simple and momentous:  An individual's homosexuality or transgender status is not relevant to employment decisions.  That's because it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex.  Consider, for example, an employer with two employees, both of whom are attracted to men.  The two individuals are, to the employer's mind, materially identical in all respects, except that one is a man and the other a woman.  If the employer fires the

male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague. Put differently, the employer intentionally singles out an employee to fire based in part on the employee's sex, and the affected employee's sex is a but-for cause of his discharge. Or take an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth. Again, the individual employee's sex plays an unmistakable and impermissible role in the discharge decision.

That distinguishes these cases from countless others where Title VII has nothing to say. Take an employer who fires a female employee for tardiness or incompetence or simply supporting the wrong sports team. Assuming the employer would not have tolerated the same trait in a man, Title VII stands silent. But unlike any of these other traits or actions, homosexuality and transgender status are inextricably bound up with sex. Not because homosexuality or transgender status are related to sex in some vague sense or because discrimination on these bases has some disparate impact on one sex or another, but because to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex.

Nor does it matter that, when an employer treats one employee worse because of that individual's sex, other factors may contribute to the decision. Consider an employer with a policy of firing any woman he discovers to be a Yankees fan. Carrying out that rule because an employee is a woman *and* a fan of the Yankees is a firing "because of sex" if the employer would have tolerated the same allegiance in a male employee. Likewise here.

When an employer fires an employee because she is homosexual or transgender, two causal factors may be in play—*both* the individual's sex *and* something else (the sex to which the individual is attracted or with which the individual identifies). But Title VII doesn't care. If an employer would not have discharged an employee but for that individual's sex, the statute's causation standard is met, and liability may attach.

Reframing the additional causes in today's cases as additional intentions can do no more to insulate the employers from liability. Intentionally burning down a neighbor's house is arson, even if the perpetrator's ultimate intention (or motivation) is only to improve the view. No less, intentional discrimination based on sex violates Title VII, even if it is intended only as a means to achieving the employer's ultimate goal of discriminating against homosexual or transgender employees. There is simply no escaping the role intent plays here: Just as sex is necessarily a but-for *cause* when an employer discriminates against homosexual or transgender employees, an employer who discriminates on these grounds inescapably *intends* to rely on sex in its decisionmaking. Imagine an employer who has a policy of firing any employee known to be homosexual. The employer hosts an office holiday party and invites employees to bring their spouses. A model employee arrives and introduces a manager to Susan, the employee's wife. Will that employee be fired? If the policy works as the employer intends, the answer depends entirely on whether the model employee is a man or a woman. To be sure, that employer's ultimate goal might be to discriminate on the basis of sexual orientation. But to achieve that purpose the employer must, along the way, intentionally treat an employee worse based in part on that individual's sex.

An employer musters no better a defense by responding that it is equally happy to fire male *and* female employees who are homosexual or transgender. Title VII liability is

not limited to employers who, through the sum of all of their employment actions, treat the class of men differently than the class of women. Instead, the law makes each instance of discriminating against an individual employee because of that individual's sex an independent violation of Title VII. So just as an employer who fires both Hannah and Bob for failing to fulfill traditional sex stereotypes doubles rather than eliminates Title VII liability, an employer who fires both Hannah and Bob for being gay or transgender does the same.

At bottom, these cases involve no more than the straightforward application of legal terms with plain and settled meanings. For an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex. That has always been prohibited by Title VII's plain terms—and that "should be the end of the analysis." 883 F. 3d, at 135 (Cabranes, J., concurring in judgment).

C

If more support for our conclusion were required, there's no need to look far. All that the statute's plain terms suggest, this Court's cases have already confirmed. Consider three of our leading precedents.

In *Phillips* v. *Martin Marietta Corp.*, 400 U. S. 542 (1971) (*per curiam*), a company allegedly refused to hire women with young children, but did hire men with children the same age. Because its discrimination depended not only on the employee's sex as a female but also on the presence of another criterion—namely, being a parent of young children—the company contended it hadn't engaged in discrimination "because of" sex. The company maintained, too, that it hadn't violated the law because, as a whole, it tended to favor hiring women over men. Unsurprisingly by now,

Opinion of the Court

these submissions did not sway the Court. That an employer discriminates intentionally against an individual only in part because of sex supplies no defense to Title VII. Nor does the fact an employer may happen to favor women as a class.

In *Los Angeles Dept. of Water and Power* v. *Manhart*, 435 U. S. 702 (1978), an employer required women to make larger pension fund contributions than men. The employer sought to justify its disparate treatment on the ground that women tend to live longer than men, and thus are likely to receive more from the pension fund over time. By everyone's admission, the employer was not guilty of animosity against women or a "purely habitual assumptio[n] about a woman's inability to perform certain kinds of work"; instead, it relied on what appeared to be a statistically accurate statement about life expectancy. *Id.*, at 707–708. Even so, the Court recognized, a rule that appears evenhanded at the group level can prove discriminatory at the level of individuals. True, women as a class may live longer than men as a class. But "[t]he statute's focus on the individual is unambiguous," and any individual woman might make the larger pension contributions and still die as early as a man. *Id.*, at 708. Likewise, the Court dismissed as irrelevant the employer's insistence that its actions were motivated by a wish to achieve classwide equality between the sexes: An employer's intentional discrimination on the basis of sex is no more permissible when it is prompted by some further intention (or motivation), even one as prosaic as seeking to account for actuarial tables. *Ibid.* The employer violated Title VII because, when its policy worked exactly as planned, it could not "pass the simple test" asking whether an individual female employee would have been treated the same regardless of her sex. *Id.*, at 711.

In *Oncale* v. *Sundowner Offshore Services, Inc.*, 523 U. S. 75 (1998), a male plaintiff alleged that he was singled out by his male co-workers for sexual harassment. The Court

held it was immaterial that members of the same sex as the victim committed the alleged discrimination. Nor did the Court concern itself with whether men as a group were subject to discrimination or whether something in addition to sex contributed to the discrimination, like the plaintiff's conduct or personal attributes. "[A]ssuredly," the case didn't involve "the principal evil Congress was concerned with when it enacted Title VII." *Id.*, at 79. But, the Court unanimously explained, it is "the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Ibid.* Because the plaintiff alleged that the harassment would not have taken place but for his sex—that is, the plaintiff would not have suffered similar treatment if he were female—a triable Title VII claim existed.

The lessons these cases hold for ours are by now familiar.

First, it's irrelevant what an employer might call its discriminatory practice, how others might label it, or what else might motivate it. In *Manhart*, the employer called its rule requiring women to pay more into the pension fund a "life expectancy" adjustment necessary to achieve sex equality. In *Phillips*, the employer could have accurately spoken of its policy as one based on "motherhood." In much the same way, today's employers might describe their actions as motivated by their employees' homosexuality or transgender status. But just as labels and additional intentions or motivations didn't make a difference in *Manhart* or *Phillips*, they cannot make a difference here. When an employer fires an employee for being homosexual or transgender, it necessarily and intentionally discriminates against that individual in part because of sex. And that is all Title VII has ever demanded to establish liability.

Second, the plaintiff's sex need not be the sole or primary cause of the employer's adverse action. In *Phillips*, *Manhart*, and *Oncale*, the defendant easily could have pointed to some other, nonprotected trait and insisted it was the

Opinion of the Court

more important factor in the adverse employment outcome. So, too, it has no significance here if another factor—such as the sex the plaintiff is attracted to or presents as—might also be at work, or even play a more important role in the employer's decision.

Finally, an employer cannot escape liability by demonstrating that it treats males and females comparably as groups. As *Manhart* teaches, an employer is liable for intentionally requiring an individual female employee to pay more into a pension plan than a male counterpart even if the scheme promotes equality at the group level. Likewise, an employer who intentionally fires an individual homosexual or transgender employee in part because of that individual's sex violates the law even if the employer is willing to subject all male and female homosexual or transgender employees to the same rule.

### III

What do the employers have to say in reply? For present purposes, they do not dispute that they fired the plaintiffs for being homosexual or transgender. Sorting out the true reasons for an adverse employment decision is often a hard business, but none of that is at issue here. Rather, the employers submit that even intentional discrimination against employees based on their homosexuality or transgender status supplies no basis for liability under Title VII.

The employers' argument proceeds in two stages. Seeking footing in the statutory text, they begin by advancing a number of reasons why discrimination on the basis of homosexuality or transgender status doesn't involve discrimination because of sex. But each of these arguments turns out only to repackage errors we've already seen and this Court's precedents have already rejected. In the end, the employers are left to retreat beyond the statute's text, where they fault us for ignoring the legislature's purposes

in enacting Title VII or certain expectations about its oper-
ation. They warn, too, about consequences that might fol-
low a ruling for the employees. But none of these conten-
tions about what the employers think the law was meant to
do, or should do, allow us to ignore the law as it is.

### A

Maybe most intuitively, the employers assert that dis-
crimination on the basis of homosexuality and transgender
status aren't referred to as sex discrimination in ordinary
conversation. If asked by a friend (rather than a judge) why
they were fired, even today's plaintiffs would likely respond
that it was because they were gay or transgender, not be-
cause of sex. According to the employers, that conversa-
tional answer, not the statute's strict terms, should guide
our thinking and suffice to defeat any suggestion that the
employees now before us were fired because of sex. Cf. *post,*
at 3 (ALITO, J., dissenting); *post,* at 8–13 (KAVANAUGH, J.,
dissenting).

But this submission rests on a mistaken understanding
of what kind of cause the law is looking for in a Title VII
case. In conversation, a speaker is likely to focus on what
seems most relevant or informative to the listener. So an
employee who has just been fired is likely to identify the
primary or most direct cause rather than list literally every
but-for cause. To do otherwise would be tiring at best. But
these conversational conventions do not control Title VII's
legal analysis, which asks simply whether sex was a but-for
cause. In *Phillips*, for example, a woman who was not hired
under the employer's policy might have told her friends that
her application was rejected because she was a mother, or
because she had young children. Given that many women
could be hired under the policy, it's unlikely she would say
she was not hired because she was a woman. But the Court
did not hesitate to recognize that the employer in *Phillips*
discriminated against the plaintiff because of her sex. Sex

wasn't the only factor, or maybe even the main factor, but it was one but-for cause—and that was enough.  You can call the statute's but-for causation test what you will—expansive, legalistic, the dissents even dismiss it as wooden or literal.  But it is the law.

Trying another angle, the defendants before us suggest that an employer who discriminates based on homosexuality or transgender status doesn't *intentionally* discriminate based on sex, as a disparate treatment claim requires.  See *post*, at 9–12 (ALITO, J., dissenting); *post*, at 12–13 (KAVANAUGH, J., dissenting).  But, as we've seen, an employer who discriminates against homosexual or transgender employees necessarily and intentionally applies sex-based rules.  An employer that announces it will not employ anyone who is homosexual, for example, intends to penalize male employees for being attracted to men and female employees for being attracted to women.

What, then, do the employers mean when they insist intentional discrimination based on homosexuality or transgender status isn't intentional discrimination based on sex?  Maybe the employers mean they don't intend to harm one sex or the other as a class.  But as should be clear by now, the statute focuses on discrimination against individuals, not groups.  Alternatively, the employers may mean that they don't perceive themselves as motivated by a desire to discriminate based on sex.  But nothing in Title VII turns on the employer's labels or any further intentions (or motivations) for its conduct beyond sex discrimination.  In *Manhart*, the employer intentionally required women to make higher pension contributions only to fulfill the further purpose of making things more equitable between men and women as groups.  In *Phillips*, the employer may have perceived itself as discriminating based on motherhood, not sex, given that its hiring policies as a whole *favored* women.  But in both cases, the Court set all this aside as irrelevant.  The employers' policies involved intentional discrimination

because of sex, and Title VII liability necessarily followed.

Aren't these cases different, the employers ask, given that an employer could refuse to hire a gay or transgender individual without ever learning the applicant's sex? Suppose an employer asked homosexual or transgender applicants to tick a box on its application form. The employer then had someone else redact any information that could be used to discern sex. The resulting applications would disclose which individuals are homosexual or transgender without revealing whether they also happen to be men or women. Doesn't that possibility indicate that the employer's discrimination against homosexual or transgender persons cannot be sex discrimination?

No, it doesn't. Even in this example, the individual applicant's sex still weighs as a factor in the employer's decision. Change the hypothetical ever so slightly and its flaws become apparent. Suppose an employer's application form offered a single box to check if the applicant is either black or Catholic. If the employer refuses to hire anyone who checks that box, would we conclude the employer has complied with Title VII, so long as it studiously avoids learning any particular applicant's race or religion? Of course not: By intentionally setting out a rule that makes hiring turn on race or religion, the employer violates the law, whatever he might know or not know about individual applicants.

The same holds here. There is no way for an applicant to decide whether to check the homosexual or transgender box without considering sex. To see why, imagine an applicant doesn't know what the words homosexual or transgender mean. Then try writing out instructions for who should check the box without using the words man, woman, or sex (or some synonym). It can't be done. Likewise, there is no way an employer can discriminate against those who check the homosexual or transgender box without discriminating in part because of an applicant's sex. By discriminating against homosexuals, the employer intentionally penalizes

men for being attracted to men and women for being at-
tracted to women.  By discriminating against transgender
persons, the employer unavoidably discriminates against
persons with one sex identified at birth and another today.
Any way you slice it, the employer intentionally refuses to
hire applicants in part because of the affected individuals'
sex, even if it never learns any applicant's sex.

Next, the employers turn to Title VII's list of protected
characteristics—race, color, religion, sex, and national
origin.  Because homosexuality and transgender status
can't be found on that list and because they are conceptu-
ally distinct from sex, the employers reason, they are im-
plicitly excluded from Title VII's reach.  Put another way, if
Congress had wanted to address these matters in Title VII,
it would have referenced them specifically.  Cf. *post,* at 7–8
(ALITO, J., dissenting); *post,* at 13–15 (KAVANAUGH, J., dis-
senting).

But that much does not follow.  We agree that homosex-
uality and transgender status are distinct concepts from
sex.  But, as we've seen, discrimination based on homosex-
uality or transgender status necessarily entails discrimina-
tion based on sex; the first cannot happen without the sec-
ond.  Nor is there any such thing as a "canon of donut holes,"
in which Congress's failure to speak directly to a specific
case that falls within a more general statutory rule creates
a tacit exception.  Instead, when Congress chooses not to
include any exceptions to a broad rule, courts apply the
broad rule.  And that is exactly how this Court has always
approached Title VII.  "Sexual harassment" is conceptually
distinct from sex discrimination, but it can fall within Title
VII's sweep.  *Oncale*, 523 U. S., at 79–80.  Same with "moth-
erhood discrimination."  See *Phillips*, 400 U. S., at 544.
Would the employers have us reverse those cases on the
theory that Congress could have spoken to those problems
more specifically?  Of course not.  As enacted, Title VII pro-
hibits all forms of discrimination because of sex, however

they may manifest themselves or whatever other labels might attach to them.

The employers try the same point another way. Since 1964, they observe, Congress has considered several proposals to add sexual orientation to Title VII's list of protected characteristics, but no such amendment has become law. Meanwhile, Congress has enacted other statutes addressing other topics that do discuss sexual orientation. This postenactment legislative history, they urge, should tell us something. Cf. *post*, at 2, 42–43 (ALITO, J., dissenting); *post*, at 4, 15–16 (KAVANAUGH, J., dissenting).

But what? There's no authoritative evidence explaining why later Congresses adopted other laws referencing sexual orientation but didn't amend this one. Maybe some in the later legislatures understood the impact Title VII's broad language already promised for cases like ours and didn't think a revision needed. Maybe others knew about its impact but hoped no one else would notice. Maybe still others, occupied by other concerns, didn't consider the issue at all. All we can know for certain is that speculation about why a later Congress declined to adopt new legislation offers a "particularly dangerous" basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt. *Pension Benefit Guaranty Corporation* v. *LTV Corp.*, 496 U. S. 633, 650 (1990); see also *United States* v. *Wells*, 519 U. S. 482, 496 (1997); *Sullivan* v. *Finkelstein*, 496 U. S. 617, 632 (1990) (Scalia, J., concurring) ("Arguments based on subsequent legislative history . . . should not be taken seriously, not even in a footnote").

That leaves the employers to seek a different sort of exception. Maybe the traditional and simple but-for causation test should apply in all other Title VII cases, but it just doesn't work when it comes to cases involving homosexual and transgender employees. The test is too blunt to capture the nuances here. The employers illustrate their concern with an example. When we apply the simple test to Mr.

Bostock—asking whether Mr. Bostock, a man attracted to other men, would have been fired had he been a woman—we don't just change his sex.  Along the way, we change his sexual orientation too (from homosexual to heterosexual). If the aim is to isolate whether a plaintiff's sex caused the dismissal, the employers stress, we must hold sexual orientation constant—meaning we need to change both his sex and the sex to which he is attracted.  So for Mr. Bostock, the question should be whether he would've been fired if he were a woman attracted to women.  And because his employer would have been as quick to fire a lesbian as it was a gay man, the employers conclude, no Title VII violation has occurred.

While the explanation is new, the mistakes are the same. The employers might be onto something if Title VII only ensured equal treatment between groups of men and women or if the statute applied only when sex is the sole or primary reason for an employer's challenged adverse employment action.  But both of these premises are mistaken.  Title VII's plain terms and our precedents don't care if an employer treats men and women comparably as groups; an employer who fires both lesbians and gay men equally doesn't diminish but doubles its liability.  Just cast a glance back to *Manhart*, where it was no defense that the employer sought to equalize pension contributions based on life expectancy. Nor does the statute care if other factors besides sex contribute to an employer's discharge decision.  Mr. Bostock's employer might have decided to fire him only because of the confluence of two factors, his sex and the sex to which he is attracted.  But exactly the same might have been said in *Phillips*, where motherhood was the added variable.

Still, the employers insist, something seems different here.  Unlike certain other employment policies this Court has addressed that harmed only women or only men, the employers' policies in the cases before us have the same adverse consequences for men and women.  How could sex be

Opinion of the Court

necessary to the result if a member of the opposite sex might face the same outcome from the same policy?

What the employers see as unique isn't even unusual. Often in life and law two but-for factors combine to yield a result that could have also occurred in some other way. Imagine that it's a nice day outside and your house is too warm, so you decide to open the window. Both the cool temperature outside and the heat inside are but-for causes of your choice to open the window. That doesn't change just because you also would have opened the window had it been warm outside and cold inside. In either case, no one would deny that the window is open "because of" the outside temperature. Our cases are much the same. So, for example, when it comes to homosexual employees, male sex and attraction to men are but-for factors that can combine to get them fired. The fact that female sex and attraction to women can *also* get an employee fired does no more than show the same outcome can be achieved through the combination of different factors. In either case, though, sex plays an essential but-for role.

At bottom, the employers' argument unavoidably comes down to a suggestion that sex must be the sole or primary cause of an adverse employment action for Title VII liability to follow. And, as we've seen, that suggestion is at odds with everything we know about the statute. Consider an employer eager to revive the workplace gender roles of the 1950s. He enforces a policy that he will hire only men as mechanics and only women as secretaries. When a qualified woman applies for a mechanic position and is denied, the "simple test" immediately spots the discrimination: A qualified man would have been given the job, so sex was a but-for cause of the employer's refusal to hire. But like the employers before us today, this employer would say not so fast. By comparing the woman who applied to be a mechanic to a man who applied to be a mechanic, we've quietly

Opinion of the Court

changed two things: the applicant's sex and her trait of failing to conform to 1950s gender roles. The "simple test" thus overlooks that it is really the applicant's bucking of 1950s gender roles, not her sex, doing the work. So we need to hold that second trait constant: Instead of comparing the disappointed female applicant to a man who applied for the same position, the employer would say, we should compare her to a man who applied to be a secretary. And because that jobseeker would be refused too, this must not be sex discrimination.

No one thinks *that*, so the employers must scramble to justify deploying a stricter causation test for use only in cases involving discrimination based on sexual orientation or transgender status. Such a rule would create a curious discontinuity in our case law, to put it mildly. Employer hires based on sexual stereotypes? Simple test. Employer sets pension contributions based on sex? Simple test. Employer fires men who do not behave in a sufficiently masculine way around the office? Simple test. But when that same employer discriminates against women who are attracted to women, or persons identified at birth as women who later identify as men, we suddenly roll out a new and more rigorous standard? Why are *these* reasons for taking sex into account different from all the rest? Title VII's text can offer no answer.

## B

Ultimately, the employers are forced to abandon the statutory text and precedent altogether and appeal to assumptions and policy. Most pointedly, they contend that few in 1964 would have expected Title VII to apply to discrimination against homosexual and transgender persons. And whatever the text and our precedent indicate, they say, shouldn't this fact cause us to pause before recognizing liability?

It might be tempting to reject this argument out of hand.

This Court has explained many times over many years that, when the meaning of the statute's terms is plain, our job is at an end. The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration. See, *e.g.*, *Carcieri* v. *Salazar*, 555 U. S. 379, 387 (2009); *Connecticut Nat. Bank* v. *Germain*, 503 U. S. 249, 253–254 (1992); *Rubin* v. *United States*, 449 U. S. 424, 430 (1981). Of course, some Members of this Court have consulted legislative history when interpreting *ambiguous* statutory language. Cf. *post*, at 40 (ALITO, J., dissenting). But that has no bearing here. "Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it." *Milner* v. *Department of Navy*, 562 U. S. 562, 574 (2011). And as we have seen, no ambiguity exists about how Title VII's terms apply to the facts before us. To be sure, the statute's application in these cases reaches "beyond the principal evil" legislators may have intended or expected to address. *Oncale*, 523 U. S., at 79. But "'the fact that [a statute] has been applied in situations not expressly anticipated by Congress'" does not demonstrate ambiguity; instead, it simply "'demonstrates [the] breadth'" of a legislative command. *Sedima, S. P. R. L.* v. *Imrex Co.*, 473 U. S. 479, 499 (1985). And "it is ultimately the provisions of" those legislative commands "rather than the principal concerns of our legislators by which we are governed." *Oncale*, 523 U. S., at 79; see also A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 101 (2012) (noting that unexpected applications of broad language reflect only Congress's "presumed point [to] produce general coverage—not to leave room for courts to recognize ad hoc exceptions").

Still, while legislative history can never defeat unambiguous statutory text, historical sources can be useful for a different purpose: Because the law's ordinary meaning at the time of enactment usually governs, we must be sensitive to the possibility a statutory term that means one thing

Opinion of the Court

today or in one context might have meant something else at the time of its adoption or might mean something different in another context. And we must be attuned to the possibility that a statutory phrase ordinarily bears a different meaning than the terms do when viewed individually or literally. To ferret out such shifts in linguistic usage or subtle distinctions between literal and ordinary meaning, this Court has sometimes consulted the understandings of the law's drafters as some (not always conclusive) evidence. For example, in the context of the National Motor Vehicle Theft Act, this Court admitted that the term "vehicle" in 1931 could literally mean "a conveyance working on land, water or air." *McBoyle* v. *United States*, 283 U. S. 25, 26 (1931). But given contextual clues and "everyday speech" at the time of the Act's adoption in 1919, this Court concluded that "vehicles" in that statute included only things "moving on land," not airplanes too. *Ibid.* Similarly, in *New Prime*, we held that, while the term "contracts of employment" today might seem to encompass only contracts with employees, at the time of the statute's adoption the phrase was ordinarily understood to cover contracts with independent contractors as well. 586 U. S., at ___–___ (slip op., at 6–9). Cf. *post,* at 7–8 (KAVANAUGH, J., dissenting) (providing additional examples).

The employers, however, advocate nothing like that here. They do not seek to use historical sources to illustrate that the meaning of any of Title VII's language has changed since 1964 or that the statute's terms, whether viewed individually or as a whole, ordinarily carried some message we have missed. To the contrary, as we have seen, the employers *agree* with our understanding of all the statutory language—"discriminate against any individual . . . because of such individual's . . . sex." Nor do the competing dissents offer an alternative account about what these terms mean either when viewed individually or in the ag-

Opinion of the Court

gregate. Rather than suggesting that the statutory language bears some other *meaning*, the employers and dissents merely suggest that, because few in 1964 expected today's *result*, we should not dare to admit that it follows ineluctably from the statutory text. When a new application emerges that is both unexpected and important, they would seemingly have us merely point out the question, refer the subject back to Congress, and decline to enforce the plain terms of the law in the meantime.

That is exactly the sort of reasoning this Court has long rejected. Admittedly, the employers take pains to couch their argument in terms of seeking to honor the statute's "expected applications" rather than vindicate its "legislative intent." But the concepts are closely related. One could easily contend that legislators only intended expected applications or that a statute's purpose is limited to achieving applications foreseen at the time of enactment. However framed, the employer's logic impermissibly seeks to displace the plain meaning of the law in favor of something lying beyond it.

If anything, the employers' new framing may only add new problems. The employers assert that "no one" in 1964 or for some time after would have anticipated today's result. But is that really true? Not long after the law's passage, gay and transgender employees began filing Title VII complaints, so at least *some* people foresaw this potential application. See, *e.g.*, *Smith* v. *Liberty Mut. Ins. Co.*, 395 F. Supp. 1098, 1099 (ND Ga. 1975) (addressing claim from 1969); *Holloway* v. *Arthur Andersen & Co.*, 566 F. 2d 659, 661 (CA9 1977) (addressing claim from 1974). And less than a decade after Title VII's passage, during debates over the Equal Rights Amendment, others counseled that its language—which was strikingly similar to Title VII's—might also protect homosexuals from discrimination. See, *e.g.*, Note, The Legality of Homosexual Marriage, 82 Yale L. J. 573, 583–584 (1973).

Opinion of the Court

Why isn't that enough to demonstrate that today's result isn't totally unexpected? How many people have to foresee the application for it to qualify as "expected"? Do we look only at the moment the statute was enacted, or do we allow some time for the implications of a new statute to be worked out? Should we consider the expectations of those who had no reason to give a particular application any thought or only those with reason to think about the question? How do we account for those who change their minds over time, after learning new facts or hearing a new argument? How specifically or generally should we frame the "application" at issue? None of these questions have obvious answers, and the employers don't propose any.

One could also reasonably fear that objections about unexpected applications will not be deployed neutrally. Often lurking just behind such objections resides a cynicism that Congress could not *possibly* have meant to protect a disfavored group. Take this Court's encounter with the Americans with Disabilities Act's directive that no "'public entity'" can discriminate against any "'qualified individual with a disability.'" *Pennsylvania Dept. of Corrections* v. *Yeskey*, 524 U. S. 206, 208 (1998). Congress, of course, didn't list every public entity the statute would apply to. And no one batted an eye at its application to, say, post offices. But when the statute was applied to *prisons*, curiously, some demanded a closer look: Pennsylvania argued that "Congress did not 'envisio[n] that the ADA would be applied to state prisoners.'" *Id.*, at 211–212. This Court emphatically rejected that view, explaining that, "in the context of an unambiguous statutory text," whether a specific application was anticipated by Congress "is irrelevant." *Id.*, at 212. As *Yeskey* and today's cases exemplify, applying protective laws to groups that were politically unpopular at the time of the law's passage—whether prisoners in the 1990s or homosexual and transgender employees

in the 1960s—often may be seen as unexpected.  But to re-
fuse enforcement just because of that, because the parties
before us happened to be unpopular at the time of the law's
passage, would not only require us to abandon our role as
interpreters of statutes; it would tilt the scales of justice in
favor of the strong or popular and neglect the promise that
all persons are entitled to the benefit of the law's terms.  Cf.
*post*, at 28–35 (ALITO, J., dissenting); *post,* at 21–22
(KAVANAUGH, J., dissenting).

The employer's position also proves too much.  If we ap-
plied Title VII's plain text only to applications some (yet-to-
be-determined) group expected in 1964, we'd have more
than a little law to overturn.  Start with *Oncale.*  How many
people in 1964 could have expected that the law would turn
out to protect male employees?  Let alone to protect them
from harassment by other male employees?  As we acknowl-
edged at the time, "male-on-male sexual harassment in the
workplace was assuredly not the principal evil Congress
was concerned with when it enacted Title VII."  523 U. S.,
at 79.  Yet the Court did not hesitate to recognize that Title
VII's plain terms forbade it.  Under the employer's logic, it
would seem this was a mistake.

That's just the beginning of the law we would have to un-
ravel.  As one Equal Employment Opportunity Commission
(EEOC) Commissioner observed shortly after the law's pas-
sage, the words of "'the sex provision of Title VII [are] diffi-
cult to . . . control.'"  Franklin, Inventing the "Traditional
Concept" of Sex Discrimination, 125 Harv. L. Rev. 1307,
1338 (2012) (quoting Federal Mediation Service To Play
Role in Implementing Title VII, [1965–1968 Transfer
Binder] CCH Employment Practices ¶8046, p. 6074).  The
"difficult[y]" may owe something to the initial proponent of
the sex discrimination rule in Title VII, Representative
Howard Smith.  On some accounts, the congressman may
have wanted (or at least was indifferent to the possibility

Opinion of the Court

of) broad language with wide-ranging effect.  Not neces-
sarily because he was interested in rooting out sex discrim-
ination in all its forms, but because he may have hoped to
scuttle the whole Civil Rights Act and thought that adding
language covering sex discrimination would serve as a poi-
son pill.  See C. Whalen & B. Whalen, The Longest Debate:
A Legislative History of the 1964 Civil Rights Act 115–118
(1985).  Certainly nothing in the meager legislative history
of this provision suggests it was meant to be read narrowly.

Whatever his reasons,     thanks to the broad language
Representative Smith introduced, many, maybe most, ap-
plications of Title VII's sex provision were "unanticipated"
at the time of the law's adoption.  In fact, many now-obvious
applications met with heated opposition early on, even
among those tasked with enforcing the law.  In the years
immediately following Title VII's passage, the EEOC offi-
cially opined that listing men's positions and women's posi-
tions separately in job postings was simply helpful rather
than discriminatory.  Franklin, 125 Harv. L. Rev., at 1340
(citing Press Release, EEOC (Sept. 22, 1965)).  Some courts
held that Title VII did not prevent an employer from firing
an employee for refusing his sexual advances.  See, *e.g.*,
*Barnes* v. *Train*, 1974 WL 10628, *1 (D DC, Aug. 9, 1974).
And courts held that a policy against hiring mothers but not
fathers of young children wasn't discrimination because of
sex.  See *Phillips* v. *Martin Marietta Corp.*, 411 F. 2d 1 (CA5
1969), rev'd, 400 U. S. 542 (1971) (*per curiam*).

Over time, though, the breadth of the statutory language
proved too difficult to deny.  By the end of the 1960s, the
EEOC reversed its stance on sex-segregated job advertis-
ing.  See Franklin, 125 Harv. L. Rev., at 1345.  In 1971, this
Court held that treating women with children differently
from men with children violated Title VII.  *Phillips*, 400
U. S., at 544.  And by the late 1970s, courts began to recog-
nize that sexual harassment can sometimes amount to sex
discrimination.  See, *e.g.*, *Barnes* v. *Costle*, 561 F. 2d 983,

990 (CADC 1977).  While to the modern eye each of these examples may seem "plainly [to] constitut[e] discrimination because of biological sex," *post*, at 38 (ALITO, J., dissenting), all were hotly contested for years following Title VII's enactment.  And as with the discrimination we consider today, many federal judges long accepted interpretations of Title VII that excluded these situations.  Cf. *post*, at 21–22 (KAVANAUGH, J., dissenting) (highlighting that certain lower courts have rejected Title VII claims based on homosexuality and transgender status).  Would the employers have us undo every one of these unexpected applications too?

The weighty implications of the employers' argument from expectations also reveal why they cannot hide behind the no-elephants-in-mouseholes canon.  That canon recognizes that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions."  *Whitman* v. *American Trucking Assns.*, *Inc.*, 531 U. S. 457, 468 (2001).  But it has no relevance here.  We can't deny that today's holding—that employers are prohibited from firing employees on the basis of homosexuality or transgender status—is an elephant.  But where's the mousehole?  Title VII's prohibition of sex discrimination in employment is a major piece of federal civil rights legislation.  It is written in starkly broad terms.  It has repeatedly produced unexpected applications, at least in the view of those on the receiving end of them.  Congress's key drafting choices—to focus on discrimination against individuals and not merely between groups and to hold employers liable whenever sex is a but-for cause of the plaintiff's injuries— virtually guaranteed that unexpected applications would emerge over time.  This elephant has never hidden in a mousehole; it has been standing before us all along.

With that, the employers are left to abandon their concern for expected applications and fall back to the last line

Opinion of the Court

of defense for all failing statutory interpretation arguments: naked policy appeals.  If we were to apply the statute's plain language, they complain, any number of undesirable policy consequences would follow.  Cf. *post*, at 44–54 (ALITO, J., dissenting).  Gone here is any pretense of statutory interpretation; all that's left is a suggestion we should proceed without the law's guidance to do as we think best.  But that's an invitation no court should ever take up.  The place to make new legislation, or address unwanted consequences of old legislation, lies in Congress.  When it comes to statutory interpretation, our role is limited to applying the law's demands as faithfully as we can in the cases that come before us.  As judges we possess no special expertise or authority to declare for ourselves what a self-governing people should consider just or wise.  And the same judicial humility that requires us to refrain from adding to statutes requires us to refrain from diminishing them.

What are these consequences anyway?  The employers worry that our decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination.  And, under Title VII itself, they say sex-segregated bathrooms, locker rooms, and dress codes will prove unsustainable after our decision today.  But none of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today.  Under Title VII, too, we do not purport to address bathrooms, locker rooms, or anything else of the kind.  The only question before us is whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual "because of such individual's sex."  As used in Title VII, the term "'discriminate against'" refers to "distinctions or differences in treatment that injure protected individuals."  *Burlington N. & S. F. R.*, 548 U. S., at 59.  Firing employees because of a statutorily protected trait surely counts.  Whether other policies and practices

Opinion of the Court

might or might not qualify as unlawful discrimination or find justifications under other provisions of Title VII are questions for future cases, not these.

Separately, the employers fear that complying with Title VII's requirement in cases like ours may require some employers to violate their religious convictions. We are also deeply concerned with preserving the promise of the free exercise of religion enshrined in our Constitution; that guarantee lies at the heart of our pluralistic society. But worries about how Title VII may intersect with religious liberties are nothing new; they even predate the statute's passage. As a result of its deliberations in adopting the law, Congress included an express statutory exception for religious organizations. §2000e–1(a). This Court has also recognized that the First Amendment can bar the application of employment discrimination laws "to claims concerning the employment relationship between a religious institution and its ministers." *Hosanna-Tabor Evangelical Lutheran Church and School* v. *EEOC*, 565 U. S. 171, 188 (2012). And Congress has gone a step further yet in the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, codified at 42 U. S. C. §2000bb *et seq.* That statute prohibits the federal government from substantially burdening a person's exercise of religion unless it demonstrates that doing so both furthers a compelling governmental interest and represents the least restrictive means of furthering that interest. §2000bb–1. Because RFRA operates as a kind of super statute, displacing the normal operation of other federal laws, it might supersede Title VII's commands in appropriate cases. See §2000bb–3.

But how these doctrines protecting religious liberty interact with Title VII are questions for future cases too. Harris Funeral Homes did unsuccessfully pursue a RFRA-based defense in the proceedings below. In its certiorari petition, however, the company declined to seek review of that adverse decision, and no other religious liberty claim is now

Opinion of the Court

before us.  So while other employers in other cases may raise free exercise arguments that merit careful consideration, none of the employers before us today represent in this Court that compliance with Title VII will infringe their own religious liberties in any way.

*

Some of those who supported adding language to Title VII to ban sex discrimination may have hoped it would derail the entire Civil Rights Act.  Yet, contrary to those intentions, the bill became law.  Since then, Title VII's effects have unfolded with far-reaching consequences, some likely beyond what many in Congress or elsewhere expected.

But none of this helps decide today's cases.  Ours is a society of written laws.  Judges are not free to overlook plain statutory commands on the strength of nothing more than suppositions about intentions or guesswork about expectations.  In Title VII, Congress adopted broad language making it illegal for an employer to rely on an employee's sex when deciding to fire that employee.  We do not hesitate to recognize today a necessary consequence of that legislative choice:  An employer who fires an individual merely for being gay or transgender defies the law.

The judgments of the Second and Sixth Circuits in Nos. 17–1623 and 18–107 are affirmed.  The judgment of the Eleventh Circuit in No. 17–1618 is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*